**ORIGINAL**

Approved: _____
        SHAWN G. CROWLEY/DANIEL C. RICHENTHAL
        Assistant United States Attorneys

Before:   HONORABLE SARAH NETBURN
          United States Magistrate Judge
          Southern District of New York

**15 MAG   4277**

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - v. -

PETRONILA PERALTA,
  a/k/a "Petra,"

          Defendant.

- - - - - - - - - - - - - - - - - - X

:
:   **SEALED COMPLAINT**
:
:   Violations of
:   18 U.S.C. §§ 1349,
:   1028A, and 2
:
:   COUNTY OF OFFENSE:
:   BRONX
:

U.S. DISTRICT COURT
FILED
NOV 30 2015
D.S.
S.D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

      OCTAVIA HILL, being duly sworn, deposes and says that she is an Assistant Inspector General from the New York City Department of the Investigation ("DOI") and charges as follows:

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

      1.    From at least in or about 2008 up to and including at least in or about May 2011, in the Southern District of New York and elsewhere, PETRONILA PERALTA, a/k/a "Petra," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to commit wire fraud.

      2.    It was a part and an object of the conspiracy that PETRONILA PERALTA, a/k/a "Petra," the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of

executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

COUNT TWO
(Aggravated Identity Theft)

3.    From at least in or about November 2010, up to and including at least in or about May 2011, in the Southern District of New York and elsewhere, PETRONILA PERALTA, a/k/a "Petra," the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, PERALTA used a unique electronic identification number of another individual in connection with the offense charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4.    I am an Assistant Inspector General and have been with DOI for approximately 26 years.  Through my training and experience, I have become familiar with various public assistance programs that are administered by New York City.

5.    I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, recordings, and conversations that I have had with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents, and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Background

6.    Based on my conversations with other law enforcement officers, and my participation in this investigation, I have learned, in substance and in part, the following:

a.    Since in or about early 2014, DOI has been investigating a scheme, as described further below, to commit extensive public assistance fraud.  The investigation has revealed that the scheme originated with and was run by PETRONILA PERALTA, a/k/a "Petra," the defendant, who worked at the New York City Human Resources Administration ("HRA") from in or about 2005 through in or about August 2014, most recently as a Job Opportunity Specialist.  In that capacity, she provided economic support and employment related services to persons in need, to promote individual and family self-sufficiency.  Most recently, PERALTA worked at the East River Jobs Center in Queens, New York.

b.    Based on my training and experience and my conversations with others, I am aware that HRA is an agency of the City of New York (the "City") in charge of the majority of the City's public assistance programs.  Among other things, HRA provides temporary help to individuals and families with social service and economic needs to assist them in reaching self-sufficiency.  Its services include, among other things, administering the federally-funded Temporary Aid to Needy Families Program ("TANF").

c.    TANF is a federally-funded public assistance program administered in the City by HRA, in which monetary benefits, called Cash Assistance Benefits, are provided to eligible individuals and families.  Eligible families may receive up to 60 months of federally funded Cash Assistance Benefits, and single individuals without children or families, who have already received Cash Assistance Benefits for 60 months, may receive benefits under the New York State Safety Net Program ("Safety Net").  Individuals apply for Safety Net benefits at HRA job centers ("Job Centers") in their borough of residence in New York City.  If an individual meets income eligibility guidelines, that individual receives a Common Benefit Identification Card ("CBIC").  If an individual already has a card in connection with another public assistance program, he or she is authorized to have Cash Assistance funds loaded onto the card.

3

        d.    Cash Assistance Benefits are issued onto a CBIC semi-monthly, with the benefit amount determined based upon the individual's income and family size.  The individual accesses Cash Assistance benefits using the CBIC in one of three ways: by swiping the CBIC at an Automated Teller Machine ("ATM") and receiving cash, by swiping the CBIC at a grocery store or other merchant store, or through the Electronic Benefit Transfer ("EBT") system.  The EBT system, which is authorized and maintained by the New York State Office of Temporary and Disability Assistance ("OTDA"), allows users to swipe the CBIC at EBT machines throughout the City using an assigned Personal Identification Number ("PIN") to withdraw cash.

        e.    JPMorgan Chase, which administered the funding for TANF and Safety Net in the City during the pertinent time, maintained a customer service hotline ("the JPMorgan Hotline") which Cash Benefits recipients could use to report lost or stolen cards, make balance inquiries, or change PINs.

        f.    JPMorgan Chase allocated money from funding sources to HRA bank accounts in the City, including those used to fund TANF and Safety Net, by means of an interstate wire.

        g.    If a client loses his or her CBIC, the client can request a new card at the local Job Center.  The new card is either mailed to the client or picked up at an over-the-counter site.

        h.    Information about HRA clients and Cash Assistance Benefits is maintained in a variety of New York City and New York State databases.  One source of information about Cash Assistance deposits onto clients' CBIC is maintained by OTDA in the Specialized Fraud and Abuse Reporting System ("SFARS"), a document similar to a bank statement displaying each deposit onto a recipient's account and each time the recipient spends the funds.  SFARS displays cash deposits into a recipients' account, including the date, time, and amount of the deposit.  Additionally, SFARS displays each time a recipient spends cash benefits, including the date, time, location, and purchase amount of each transaction.  Information about actions taken on every HRA client's account, including cash benefits, is also maintained by New York State in the Welfare Management System ("WMS").  WMS retains any action taken on a client's account, and also retains the WMS worker identification number of the HRA employee who took that action.  The information can be obtained from WMS Audit Logs, a report which displays most actions taken on every HRA client's cases and the WMS worker

identification numbers ("WMS IDs") of HRA employees who took the actions on the case in question.  WMS IDs are unique, in that they are assigned only to one employee, and HRA policy prohibits the sharing of IDs and passwords.

        i.    In this investigation, DOI and HRA identified numerous fraudulent "previous month supplemental" issuances of Cash Assistance benefits ("Supplemental Issuance") onto numerous CBICs.  A Supplemental Issuance is loaded onto a CBIC when, in the previous month, a Safety Net recipient receives cash that is less than the amount she/he was due.  The Supplemental Issuance provides the difference between the amount of Cash Assistance benefits the client was entitled to receive the previous month, and the amount the client actually received. In the ordinary course, HRA employees at HRA centers initiate, process, and issue Supplemental Issuances to eligible Safety Net recipients.

        j.    A Supplemental Issuance is initiated in the normal course by an HRA case worker at an HRA Job Center. Generally, case workers are only permitted to initiate and disburse Supplemental Issuances for individuals associated with the job center at which they work.  The process for initiating and disbursing Supplemental Issuances is as follows:

        i.    An HRA case worker determines, either through his or her own inquiry or because he or she has been contacted by a client, that a recipient of Safety Net funds did not receive the total funds he or she was due during the previous month.

        ii.    The caseworker then queries the WMS to verify the client's account information.  To query the WMS, the caseworker enters his or her personal WMS user identification code.  The caseworker then checks the client's WMS account to determine whether the client received all of the Safety Net benefits to which he or she was due the previous month.  If the Safety Net recipient did not receive the entire amount of benefits to which he or she was due, the caseworker determines that the client is entitled to receive a Supplemental Issuance.

        iii.    If the caseworker determines that the recipient is entitled to a Supplemental Issuance, the caseworker accesses the Paperless Office System ("POS"), an online system maintained by HRA, and indicates (1) that the recipient is entitled to a Supplemental Issuance, and (2) the amount of Supplemental Issuance to be paid.  Upon approval by the

caseworker's supervisor, the Supplemental Issuance is then disbursed onto the client's CBIC.

            iv.    On the rare occasion that the POS is not functioning, the caseworker, after completing the actions described above, may manually complete a HRA LDSS 3575 ("LDS Form"). The LDS Form, which authorizes HRA to disburse Supplemental Issuance, is then signed by the case worker's supervisor, and the Supplemental Issuance is disbursed into the client's account.

            v.    Once the Supplemental Issuance has been disbursed into a client's account, the client may access the funds using the CBIC, as described above.

### Summary of the Scheme

            7.    Based on my conversations with other DOI investigators and HRA employees, my review of DOI and HRA documents, and my participation in this investigation, I have learned that between at least in or about 2008 and in or about May 2011, PETRONILA PERALTA, a/k/a "Petra," the defendant, using LDS Forms, caused to be issued more than approximately 800 fraudulent Supplement Issuances to more than approximately 140 individuals who were not entitled to such payments, which resulted in the theft of approximately $600,000 in public assistance funds. All of the fraudulent Supplemental Issuances identified to date in this investigation originated from either HRA Job Center 37, an HRA office in Queens, New York (the "East River Job Center") where, during the relevant time period, PERALTA worked as a Job Opportunity Specialist, or HRA Job Center 26, an HRA office in New York, New York, where, during the relevant time period, PERALTA also worked as a Job Opportunity Specialist. Generally speaking, as described more fully below, the fraudulent scheme worked as follows:

            a.    PERALTA's co-conspirators (the "Recruiters") identified individuals in, among other places, the Bronx, New York who received Safety Net funds, and informed them, in substance and in part, that, if they provided the Recruiters with their CBICs or EBT cards, an individual who worked for HRA would load additional funds to their cards. These individuals (the "Fraudulent Recipients") provided the Recruiters with their CBICs or EBT cards.

            b.    PERALTA used the WMS to locate the account information for the Fraudulent Recipients.

6

c.    Thereafter, PERALTA submitted LDS Forms authorizing Supplemental Issuances to each of the Fraudulent Recipients' accounts.  PERALTA's supervisors approved each of the LDS forms.  The Supplemental Issuance was then loaded onto the Fraudulent Recipients' CBIC or EBT card.

d.    Several days later, the Recruiters contacted the Fraudulent Recipients and informed them that the Supplemental Issuance had been loaded onto their CBICs.  The Fraudulent Recipients, pursuant to the Recruiters' instructions, then withdrew the Supplemental Issuance, kept a portion of it for themselves, and provided the rest to the Recruiters.

### The Investigation

8.    Based on my conversations with other law enforcement officers, and my review of DOI and HRA documents, I am aware that DOI has identified dozens of individuals believed to be Fraudulent Recipients throughout the relevant period.  The details of some of the Fraudulent Recipients are outlined below.

### Fraudulent Recipient-1

9.    Based on my review of documents maintained by HRA, my review of the WMS, and my conversations with HRA employees, I have learned, in substance and in part, the following:

a.    On or about September 1, 2009, PETRONILA PERALTA, a/k/a "Petra," the defendant, using her WMS ID, queried the public assistance account for a certain Safety Net Recipient ("Fraudulent Recipient-1" or "FR-1").

b.    That same day, PERALTA submitted approximately four separate LDS Forms for Supplemental Issuances for Fraudulent Recipient-1, authorizing a total of approximately $2,309 in United States currency.

c.    Beginning on or about September 2, 2009, at approximately 12:26 a.m., Supplemental Issuances were disbursed into FR-1's CBIC account at various times and in various intervals.  Shortly after each disbursement was made, cash was withdrawn from FR-1's account using FR-1's CBIC at different check cashing facilities.  The following chart depicts the transactions in FR-1's account:

7

| Date | Approximate Time | Transaction Type | Approximate Amount |
|------|------------------|------------------|--------------------|
| 09/02/09 | 12:22:33 AM | BENEFIT PAID | 712.00 |
| | 1:42:42 AM | Withdrawal | (502.00) |
| | 1:43:45 AM | Withdrawal | (236.95) |
| 09/03/09 | 12:26:29 AM | BENEFIT PAID | 840.00 |
| | 12:26:29 AM | BENEFIT PAID | 155.00 |
| | 12:26:29 AM | BENEFIT PAID | 475.00 |
| | 3:36:33 PM | Withdrawal | (500.00) |
| | 3:37:23 PM | Withdrawal | (500.00) |
| | 3:38:26 PM | Withdrawal | (400.00) |
| 09/04/09 | 12:08:20 AM | BENEFIT PAID | 26.00 |
| | 12:20:21 AM | BENEFIT PAID | 873.00 |
| | 12:20:21 AM | BENEFIT PAID | 873.00 |
| | 12:20:21 AM | BENEFIT PAID | 840.00 |
| | 1:43:05 AM | Withdrawal | (2,465.00) |
| 09/05/09 | 12:19:41 AM | BENEFIT PAID | 582.00 |
| | 4:47:13 PM | Withdrawal | (500.00) |
| | 4:49:48 PM | Withdrawal | (63.00) |
| 09/16/09 | 4:59:08 PM | Withdrawal | (230.00) |
| 09/26/09 | 12:06:51 AM | BENEFIT PAID | 873.00 |
| | 12:06:51 AM | BENEFIT PAID | 873.00 |
| | 2:52:10 AM | Withdrawal | (502.00) |
| | 2:52:57 AM | Withdrawal | (502.00) |
| | 2:53:33 AM | Withdrawal | (502.00) |
| | 2:54:24 AM | Withdrawal | (272.00) |

10.   On or about April 17, 2015, I and other DOI investigators interviewed FR-1.  After we identified ourselves, FR-1 informed me, in substance and in part, the following:

a.   In or about September 2009, Fraudulent Recipient-1 was standing in line at an HRA job center in the Bronx, New York when Fraudulent Recipient-1 was approached by a man FR-1 did not know ("CC-1").  CC-1 informed FR-1 that CC-1 knew an individual who was a supervisor at HRA and who could "add extra money to" FR-1's CBIC.

b.   CC-1 then took a photograph of FR-1's CBIC and told FR-1 that CC-1 would use the photograph to process the request for funds.  CC-1 asked for FR-1's cellphone number and stated that CC-1 would be in touch in the coming days.

c.   Approximately three weeks later, CC-1 approached FR-1 and provided Fraudulent Recipient-1 with a form to fill out and sign.  Fraudulent Recipient-1 filled out and signed the form.  CC-1 informed Fraudulent Recipient-1 that once

the funds were uploaded onto the CBIC, Fraudulent Recipient-1 could keep half of the money, but would need to provide the rest to CC-1.

   d. Sometime later, CC-1 called FR-1 in the evening and informed Fraudulent Recipient-1 that the money had been loaded onto FR-1's CBIC.  CC-1 instructed FR-1 to withdraw the funds and to meet CC-1 in the vicinity of Fordham Road in the Bronx, New York to provide CC-1 with the money.

   e. Thereafter, CC-1 withdrew approximately $2,000 from Fraudulent Recipient-1's account.  Fraudulent Recipient-1 then met CC-1 in the vicinity of Fordham Road and provided CC-1 with approximately $1,200.  FR-1 kept the remaining $800.

   f. CC-1 arranged for funds to be loaded onto FR-1's account on at least one other occasion, and FR-1 withdrew those funds and provided a portion of them to CC-1.

   g. FR-1 understood that FR-1 was not entitled to the funds FR-1 received from CC-1.

  11. Based on my conversations with other DOI investigators, and my review of the DOI and HRA documents, I have learned that FR-1 was not entitled to Supplemental Issuances when the payments described above were made.  I have learned further that, on or about September 1, 2009, the POS was functional and fully operational, such that HRA caseworkers would be expected to submit funding requests through POS, and not manually using LDS Forms.

<u>Fraudulent Recipient-2</u>

  12. Based on my review of documents maintained by HRA, my review of the WMS, and my conversations with HRA employees, I have learned, in substance and in part, the following:

   a. On or about July 7, 2009, PETRONILA PERALTA, a/k/a "Petra," the defendant, using her WMS ID, queried the public assistance account for a certain Safety Net Recipient ("Fraudulent Recipient-2" or "FR-2").

   b. On or about July 9, 2009, PERALTA submitted an LDS form for a Supplemental Issuance of $949 for Fraudulent Recipient-1.

c.      Beginning on or about July 10, 2009, at
approximately 12:26 a.m., Supplemental Issuances were disbursed
into FR-1's CBIC account at various times and in various
intervals.  Cash was subsequently withdrawn from FR-2's account,
either at ATMs or EBT machines, at various times in various
amounts.  The following chart depicts the transactions in
Fraudulent Recipient-2's account:

| Date | Approximate Time | Transaction Type | Approximate Amount |
|------|------------------|------------------|--------------------|
| 07/10/09 | 12:21:55 AM | BENEFITS PAID | 949.00 |
| | 11:49:53 AM | Withdrawal | (502.00) |
| | 11:50:50 AM | Withdrawal | (447.00) |
| 07/23/09 | 12:17:29 AM | BENEFITS PAID | 548.40 |
| | 12:17:29 AM | BENEFITS PAID | 471.00 |
| | 12:17:29 AM | BENEFITS PAID | 430.50 |
| | 12:17:29 AM | BENEFITS PAID | 926.00 |
| | 12:17:29 AM | BENEFITS PAID | 967.00 |
| | 12:17:29 AM | BENEFITS PAID | 694.50 |
| | 1:37:17 AM | Withdrawal | (4,000.00) |
| | 6:40:30 PM | Withdrawal | (37.40) |

d.      On or about August 28, 2009, PERALTA, using
her WMS ID, queried FR-2's public assistance account.  That same
day, PERALTA, using her WMS ID, submitted approximately five
separate LDS Forms for Supplemental Issuance totaling
approximately $3,745 in United States currency.

e.      Beginning on or about August 29, 2009, at
approximately 12:18 a.m., Supplemental Issuances were disbursed
into FR-2's CBIC account at various times and in various
intervals.  Cash was subsequently withdrawn from FR-2's account,
either at ATMs or EBT machines, at various times in various
amounts. The following chart depicts the transactions in
Fraudulent Recipient-2's account:

| Date | Approximate Time | Transaction Type | Approximate Amount |
|------|------------------|------------------|--------------------|
| 08/29/09 | 12:18:40 AM | BENEFITS PAID | 802.50 |
| | 12:18:40 AM | BENEFITS PAID | 802.50 |
| | 12:18:40 AM | BENEFITS PAID | 802.50 |
| | 12:18:40 AM | BENEFITS PAID | 802.50 |
| | 12:18:40 AM | BENEFITS PAID | 535.00 |
| | 1:22:28 AM | Withdrawal | (500.00) |
| | 1:23:36 AM | Withdrawal | (500.00) |

|          | 1:24:04 AM  | Withdrawal    | (500.00) |
|          | 1:24:31 AM  | Withdrawal    | (500.00) |
|          | 1:25:20 AM  | Withdrawal    | (500.00) |
|          | 1:25:42 AM  | Withdrawal    | (500.00) |
|          | 1:26:10 AM  | Withdrawal    | (500.00) |
|          | 1:26:55 AM  | Withdrawal    | (254.10) |
| 09/02/09 | 12:14:44 AM | BENEFITS PAID | 71.10    |
|          | 6:47:19 PM  | Withdrawal    | (61.50)  |
| 09/03/09 | 2:40:50 PM  | Withdrawal    | (9.60)   |

13.    On or about May 18, 2015, I and other DOI investigators interviewed an adult individual who identified herself as the daughter of FR-2 (the "Daughter"). After we identified ourselves, the Daughter informed me, in substance and in part, the following:

a.    In or about August 2009, the Daughter received fraudulent Supplemental Issuances using FR-2's account. The Daughter's relative introduced her to CC-1, who informed the Daughter that CC-1 knew an individual who was a supervisor at HRA who could upload benefits into FR-2's CBIC. The Daughter provided CC-1 with FR-2's name, Social Security number, and CBIC.

b.    On two separate occasions thereafter, CC-1 called the Daughter and informed her that the funds were available in FR-2's account. CC-2 further instructed the Daughter to withdraw the funds from the account. On each occasion, the Daughter, using the CBIC, withdrew the funds using EBT machines, and provided a portion of those funds to CC-2.

c.    On one occasion, the Daughter provided CC-1 with FR-2's CBIC and CC-1 used the CBIC to withdraw funds from FR-2's account.

14.    Based on my conversations with other DOI investigators, and my review of the DOI and HRA documents, I have learned that neither FR-2 nor the Daughter was entitled to Supplemental Issuances when the payments described above were made. I have learned further that, on or about July 9, 2009, and on or about August 28, 2009, the POS was functional and fully operational, such that HRA caseworkers would be expected to submit funding requests through POS, and not manually using LDS Forms.

Fraudulent Recipient-3

15.   Based on my review of documents maintained by HRA, my review of the WMS, and my conversations with HRA employees, I have learned, in substance and in part, the following:

a.   On or about August 10, 2010, the WMS ID of a former HRA employee ("Employee-1") was used to query the public assistance account for a Safety Net Recipient ("Fraudulent Recipient-3" or "FR-3").

b.   Employee-1 had been terminated from HRA on approximately June 20, 2010, and no longer had access to the WMS.

c.   The Employee-1 WMS ID was used to access FR-3's WMS account from the computer terminal of PETRONILA PERALTA, a/k/a "Petra," the defendant, at the East River Job Center (the "Peralta Computer Terminal").

d.   On or about August 11, 2009, beginning at approximately 12:33 a.m., Supplemental Issuances were disbursed into FR-3's CBIC account at various times and in various intervals.[1]  Cash was subsequently withdrawn from FR-3's account, either at ATMs or EBT machines, at various times in various amounts.  The following chart depicts the transactions in FR-3's account:

| Date | Approximate Time | Transaction Type | Approximate Amount |
|---|---|---|---|
| 08/11/10 | 12:33:34 AM | BENEFITS PAID | 873.00 |
| | 12:33:34 AM | BENEFITS PAID | 873.00 |
| | 12:33:34 AM | BENEFITS PAID | 873.00 |
| | 12:33:34 AM | BENEFITS PAID | 873.00 |
| | 11:41:22 AM | Withdrawal | (502.00) |
| | 11:42:06 AM | Withdrawal | (502.00) |
| | 11:42:47 AM | Withdrawal | (502.00) |

---

[1] Based on my participation in this investigation, I have learned that HRA did not maintain copies of the LDS Forms submitted for FR-3.  However, based on their review of the WMS and POS systems, HRA employees have confirmed that Supplemental Issuances for FR-3 were submitted through POS or WMS.  As described above, the only other method by which Supplemental Issuances may be authorized and submitted is using an LDS Form.  Because the neither WMS nor POS were used to submit Supplemental Issuances for FR-3, I believe that PETRONILA PERALTA, a/k/a "Petra," the defendant, submitted LDS Forms authorizing the Supplemental Issuances for FR-3 described above.

| | | |
|---|---|---|
| 11:43:26 AM | Withdrawal | (502.00) |
| 11:43:56 AM | Withdrawal | (502.00) |
| 11:44:40 AM | Withdrawal | (502.00) |
| 11:45:15 AM | Withdrawal | (498.83) |

        e.    On or about February 17, 2011, Employee-1's WMS ID was used, from the Peralta Computer Terminal, to query the public assistance account for a FR-3.

        f.    On or about February 18, 2011, beginning at approximately 12:26 a.m., Supplemental Issuances were disbursed into FR-3's CBIC account at various times and in various intervals.  Cash was subsequently withdrawn from FR-3's account, either at ATMs or EBT machines, at various times in various amounts.  The following chart depicts the transactions in FR-3's account:

| Date | Approximate Time | Transaction Type | Approximate Amount |
|---|---|---|---|
| | 12:26:48 AM | BENEFITS PAID | 873.00 |
| | 12:26:48 AM | BENEFITS PAID | 873.00 |
| | 12:26:48 AM | BENEFITS PAID | 873.00 |
| | 12:26:49 AM | BENEFITS PAID | 873.00 |
| | 12:55:40 AM | Withdrawal | (500.00) |
| 2/18/2011 | 12:56:49 AM | Withdrawal | (501.00) |
| | 12:57:59 AM | Withdrawal | (501.00) |
| | 1:04:26 AM | Withdrawal | (500.00) |
| | 1:06:54 AM | Withdrawal | (500.00) |
| | 1:16:00 AM | Withdrawal | (502.00) |
| | 1:16:27 AM | Withdrawal | (490.00) |

        16.    Based on my conversations with other law enforcements officers, I have learned that, on or about April 6, 2015, a detective with the New York City Police Department ("Detective-1") interviewed FR-3.  After Detective-1 identified herself, FR-3 informed Detective-1, in substance and in part, the following:

        a.    In or about 2009, FR-3 was approached by CC-1.  CC-1 informed FR-3 that CC-1 could assist FR-3 in receiving extra money from HRA.  CC-1 informed FR-3 that CC-1 had a contact who worked at an HRA job center and would obtain the money for FR-3.

          b.    CC-1 informed FR-3 that the name of CC-1's
contact at HRA was "Petra."  On one occasion, CC-1 and FR-3 were
together at a shop in the Bronx, New York, when CC-1 pointed to
a female and told FR-3 that she was the "Petra" who helped CC-1
get money from HRA.

          c.    FR-3 agreed with CC-1 to FR-3 would receive
fraudulent Supplemental Issuances, and thereafter received
fraudulent Supplemental Issuances.

          d.    FR-3 accessed FR-3's Facebook account and
showed Detective-1 the Facebook account for PETRONILA PERALTA,
a/k/a "Petra," the defendant.  FR-3 identified a photograph of
PERALTA on PERALTA's Facebook page as the individual CC-1
identified as CC-1's contact at HRA.

          17.   Based on my conversations with other DOI
investigators, and my review of the DOI and HRA documents, I
have learned that FR-3 was not entitled to Supplemental
Issuances when the payments described above were made.  I have
learned further that, on or about July 9, 2009, and on or about
August 28, 2009, the POS was functional and fully operational,
such that HRA caseworkers would be expected to submit funding
requests through POS, and not manually using LDS Forms.

                      Fraudulent Recipient-4

          18.   Based on my review of documents maintained by
HRA, my review of the WMS, and my conversations with HRA
employees, I have learned, in substance and in part, the
following:

          a.    On or about March 29, 2011, Employee-1's WMS
ID was used, from the Peralta Computer Terminal, to query the
public assistance account for a Safety Net Recipient
("Fraudulent Recipient-4" or "FR-4").

          b.    On or about March 30, 2011, beginning at
approximately 12:20 a.m., and then again on or about April 2,
2015, beginning at approximately Supplemental Issuances were
disbursed into FR-3's CBIC account at various times and in
various intervals.[2]  Cash was subsequently withdrawn from FR-4's

_____
[2] Based on my participation in this investigation, I have learned HRA did not
maintain copies of the LDS Forms submitted for FR-4.  However, based on their
review of the WMS and POS systems, HRA employees have confirmed that
Supplemental Issuances for FR-4 were submitted through POS or WMS.

                              14

account, either at ATMs or EBT machines, at various times in
various amounts. The following chart depicts the transactions in
FR-4's account:

| Date | Approximate Time | Transaction Type | Approximate Amount |
|---|---|---|---|
| 03/30/11 | 12:20:19 AM | BENEFITS PAID | 873.00 |
| | 12:20:19 AM | BENEFITS PAID | 873.00 |
| | 12:20:20 AM | BENEFITS PAID | 873.00 |
| | 12:20:20 AM | BENEFITS PAID | 873.00 |
| | 8:08:48 AM | Withdrawal | (502.00) |
| | 8:10:10 AM | Withdrawal | (502.00) |
| | 8:11:39 AM | Withdrawal | (502.00) |
| | 8:12:56 AM | Withdrawal | (502.00) |
| | 8:14:22 AM | Withdrawal | (502.00) |
| | 8:15:45 AM | Withdrawal | (502.00) |
| | 8:16:56 AM | Withdrawal | (480.38) |
| 04/02/11 | 12:27:39 AM | BENEFITS PAID | 873.00 |
| | 12:27:39 AM | BENEFITS PAID | 873.00 |
| | 12:27:39 AM | BENEFITS PAID | 873.00 |
| | 12:27:39 AM | BENEFITS PAID | 873.00 |
| | 12:27:40 AM | BENEFITS PAID | 873.00 |
| | 12:27:40 AM | BENEFITS PAID | 873.00 |
| | 12:27:40 AM | BENEFITS PAID | 873.00 |
| | 12:27:40 AM | BENEFITS PAID | 873.00 |
| | 11:31:55 AM | Withdrawal | (502.00) |
| | 11:32:20 AM | Withdrawal | (502.00) |
| | 11:32:44 AM | Withdrawal | (502.00) |
| | 11:33:07 AM | Withdrawal | (502.00) |
| | 11:33:33 AM | Withdrawal | (502.00) |
| | 11:34:01 AM | Withdrawal | (502.00) |
| | 11:34:23 AM | Withdrawal | (502.00) |
| | 11:34:45 AM | Withdrawal | (502.00) |
| | 11:35:07 AM | Withdrawal | (502.00) |
| | 11:35:34 AM | Withdrawal | (502.00) |
| | 11:36:02 AM | Withdrawal | (502.00) |
| | 11:36:28 AM | Withdrawal | (502.00) |
| | 11:36:52 AM | Withdrawal | (502.00) |
| | 11:37:21 AM | Withdrawal | (458.00) |

19.  On or about July 27, 2015, another DOI investigator and I interviewed FR-4.  After we identified ourselves, FR-4 informed me, in substance and in part, the following:

a.  In or about March 2011, FR-4 was approached by another individual ("CC-2") outside FR-4's home in the Bronx, New York.  CC-2 informed FR-4 that CC-2 knew an individual who could put cash on FR-4's CBIC.  CC-2 asked FR-4 to provide CC-2 with FR-4's CBIC.

b.  FR-4 provided CC-2 with FR-4's CBIC.  On at least two occasions thereafter, CC-2 informed FR-4 that cash had been loaded onto FR-4's card.  CC-2 then instructed FR-4 to withdraw the cash, using EBT machines, at check cashing facilities.  FR-4 withdrew the cash and provided a portion of it to CC-2.

20.  Based on my conversations with other DOI investigators, and my review of the DOI and HRA documents, I have learned that FR-4 was not entitled to Supplemental Issuances when the payments described above were made.  I have learned further that, in or about March and April 2011, the POS was functional and fully operational, such that HRA caseworkers would be expected to submit funding requests through POS, and not manually using LDS Forms.

### Other Fraudulent Recipients

21.  Based on my review of DOI and HRA documents, my conversations with other law enforcement officers, and my participation in this investigation, I have identified dozens of other Fraudulent Recipients.  For each of those Fraudulent Recipients, I have confirmed the following:

a.  None of the Fraudulent Recipients was entitled to Supplemental Issuances.

b.  All of the Fraudulent Recipients received Supplemental Issuances in various amounts at various times over the course of several days.

c.  Shortly before the Supplemental Issuances were disbursed to the Fraudulent Recipients' accounts, the Fraudulent Recipients' WMS accounts were accessed using the WMS ID for either PETRONILA PERALTA, a/k/a "Petra," the defendant,

or Employee-1.  The WMS accounts that were accessed using Employee-1's WMS ID were accessed from the Peralta Computer Terminal.[3]

d.    Of those LDS Forms authorizing the Supplemental Issuances to the Fraudulent Recipients that have been maintained by HRA, all state that they were submitted by PERALTA.[4]

e.    The majority of the Fraudulent Recipients withdrew the Supplemental Issuances using their CBICs at ATMs or EBT machines minutes after the Supplemental Issuances were loaded to the CBICs.

f.    None of the Fraudulent Recipients was associated with the East River Job Center.

22.    Based on my conversations with HRA employees, and my review of DOI and HRA documents, I have learned, in substance and in part, the following:

a.    On or about May 9, 2011, Employee-1's WMS ID was used to access the WMS accounts for five separate individuals (the "May 2011 Recipients") from the Peralta Computer Terminal at the East River Job Center.

b.    That same day, PETRONILA PERALTA, a/k/a "Petra," the defendant, submitted approximately 20 LDS Forms for Supplemental Issuances, totaling approximately $17,460, for the May 2011 Recipients.

c.    None of the May 2011 Recipients was entitled to receive Supplemental Issuances.

d.    None of the May 2011 Recipients was associated with the East River Job Center; instead, they were associated with Job Centers in throughout the City.

e.    HRA staff discovered in or about May 2011 that the May 2011 Recipients were not entitled to receive

---

[3] Based on my review of documents, I have learned that all of the Fraudulent Recipients' accounts that were accessed using Employee-1's WMS ID were accessed after Employee-1 was terminated.

[4] Based on my review of HRA and DOI documents, I have learned that fewer than 10% of the Fraudulent Recipients received their Supplemental Issuances through POS.  For each of those issuances, POS was accessed using either PERALTA's or Employee-1's WMS ID.

17

Supplemental Issuances.  Therefore, the payments were not
processed and the Supplemental Issuances were not disbursed.
The following month, HRA modified PERALTA's employment status
such that PERALTA was no longer able to access the WMS system,
submit LDS Forms, or issue HRA benefits.

    f. HRA has not identified any fraudulent
Supplemental Issuances that fit the pattern described above
after PERALTA's employment status was modified.

    WHEREFORE, the deponent respectfully requests that a
warrant be issued for the arrest of PETRONILA PERALTA, a/k/a
"Petra," the defendant, and that she be imprisoned, or bailed,
as the case may be.

                                  Octavia Hill
                                  Assistant Inspector General
                                  New York City Department of
                                  Investigation

Sworn to before me this
30th day of November, 2015.

THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

18